America Hector L. Hefner This is Hackensack University et al. Mr. Coobley, am I pronouncing your name correctly? Yes. Seat. May it please the court, Victor A. Coobley v. Hefner. I'd like to, if I may, request three minutes instead of the five minutes for rebuttal, which is what I informed the court's crier. I'm sorry, three minutes? Yes, sir. Go ahead. I want to focus on picking up on a letter that the court recently sent out to counsel, which addressed two issues. And I think the issue that drives the appeal, at least from our perspective, is the issue of whether there was evidence in the record below from which one could infer that the defendants submitted claims that the district court found were false or at least double-billed, that there was such evidence, period. And I think to start there, you really have to go back to the district court's articulation of the summary judgment standard, which was, I think, dramatically incorrect and not mere rhetoric because it was then applied. It said that Hefner, and this is a quote, and this is at the joint appendix, page 15, the district court's opinion, quote, Hefner must identify evidence that establishes the existence of all three essential elements. It said on the same page, if Hefner is unable to provide evidence sufficient to establish the existence of each of these elements, defendants will be entitled to summary judgment. And, of course, under Liberty Lobby and Third Circuit case law, manual 56, the question, again, was, was there any evidence from which it may be, any evidence from which it may be inferred that the defendants acted with reckless disregard? And the, I'll get to the actual standard for reckless disregard. Yeah, but on that note, that you said there's no evidence, you say that there is evidence of reckless disregard. Could you just throw me a lifeline and give me exactly what the evidence was that showed reckless disregard? Incidentally, we're dealing with recklessness that has the same, does it have the same meaning for FCA as it has for New Jersey State tort law, reckless wanton behavior? I'm a Third Circuit lawyer, but not a New Jersey lawyer, so it hasn't been required to be briefed. New Jersey is in tune with just about every other jurisdiction. On that point, can we limit it to that? I can answer it this way, Your Honor. What is clear here, and this is actually what the district court ruled correctly, is that under the False Claims Act, it is reckless if you, quote, fail to inquire about a certification that you're executing. And you asked, you know, what was there in the record on the issue, the question, whether there was a failure to inquire. The person who certified the claims said that she failed to inquire. That's at Joint Appendix 627. That's the person that was supposed to hit the key for showing that it's been billed specially or what? No, it's a little bit more deliberate and conscious than that, Your Honor. I mean, that person that didn't inquire, didn't make the inquiry, was who? Ms. Collins. Ms. Collins, all right. Nurse Collins, although other people could have inquired as well. So you're talking about this was her failure to ensure the accuracy or the veracity of the certifications? Yes. The district court ruled. I know what the district court ruled. I'm following up on Judge Callan's question because I think we're interested here in precisely the same thing. That is what you are arguing here and claim to have mustered as evidence before the district court of recklessness. Part of it. There's more. All right. And my point was to hear. Yes. And was that a one shot deal that she failed to acquire or did she continually? Over and over and over again. Did she know that she had to inquire? And your position is she had to know that she had to inquire. It's not my position. It's the law. My position in the law is that she had to inquire. How many times was it done? How many claims were filed? There were some 63, I believe, certifications. About what amount? A period of close to two years. And I should point out that I'm not positive on that number, but it is in the joint appendix. There was a Federal Evidence 1006 summary created of the various Medicare claims and the certifications by type. And they're tallied up there. What was she to have done that she did not do? What she could have done is call the provider and say. Not what she could have done. What did the law require her to do to avoid. Something. Reckless behavior here as you would define it. Something more than nothing. Your position, as I understand, is that she should have inquired before she billed this whether it was already billed. That's correct. Something more than nothing. Okay. And your position is she knew she had to do this and she's the agent. I would not agree on the first point. It's not in the record as far as I recall whether or not she knew she had to do it. The law imposes the obligation on an agent of a provider to make some inquiry, something more than nothing, before you're asking for money from the U.S. government. She did inquire, although her principal should have required her to make that inquiry, your position, to be more precise. Is that correct? That is more precise, correct. I don't think you need to be more precise because she was the agent. And the question is did the defendant make an inquiry, something more than nothing? And the answer is that she did not. And getting back to the evidence. Okay. Let me ask this because I want to hear what other instances of recklessness we have here. If her principal, whoever that be, that her immediate supervisor, some are up a lot, failed to advise her to be sure to make this inquiry before making the billing, just forgot, you know, just forgot to do it. Didn't do it purposely, didn't forget, or didn't know to do it and didn't tell her so that she would double bill. Is it your position that would be evidence of recklessness? If the best that you have is that they just overlooked telling her not to do this? In cases like the Medco case, what it referred to as a failure of training, which is what I take your honor to be describing, even by itself, even without signing certification after certification, month after month, year after year, and doing nothing at all to ensure that it's accurate, is sufficient to establish reckless disregard. Just the failure of training. And here there was a failure of training. There was no compliance plan. And that was true both with respect to Medicare compliance and to grant compliance. It was sloppy. Look, they paid. They had to pay me. Without cutting. I didn't get the last. I mean, obviously, what they did was wrong here. I thought they wouldn't have to pay the government back. They're allowed to make a mistake. Mistake is what happens when you do something more than nothing. And as in the Wang case, the something comprised a math calculation. And the math calculation was wrong. That's a mistake. Mistakes happen to people who actually tried to do something. This wasn't the case here. What else do we have here in addition to this, whatever it be, a mistake or recklessness, whatever you want to label it? Yes. Failure in total to inquire at all is the way I see it. Nobody else made an inquiry. So it wasn't just Nurse Collins. I'm sure she's a fine person. Maybe she wasn't trained properly. But it wasn't all on her shoulders. This is a large defendant. And this is a defendant. This is in the joint appendix as well. It was operating in the context of being under attack in two other false claims proceedings. One brought by the Department of Justice. So this is a defendant that knew that its billing had problems. And yet still this happened. How do you answer the allegation then? Well, it's a fact that any number of other very substantial parties, such as the appellee, seem to have made the same mistake and had to reimburse the government. Are you referring to the statement in the district court's opinion concerning subsequent clarifications? Well, it appears that any number of other payees may have made similar clerical, whatever you want to call it, mistakes. Well, I'm not sure where that is in the record. But if the mistake was the result of certifying compliance and no prior payments, no money. Clerical mistakes. Well, that's not what we have here. There is such a thing as a clerical mistake. And there are cases that address that. And as I say, cases like the Wine case make it clear that when you actually do something more than nothing and then you make a mistake doing that, then you get the benefit of being human. Wasn't the hiring of a government compliance expert conduct that constituted more than nothing? No, because it occurred after the billing and the knowledge is you can't submit a false claim recklessly or with actual knowledge and get caught, which is what happened here. Or catch yourself, because that was disputed below. And then hire later a compliance consultant to kind of erase your memory. If they had caught the mistake themselves before anybody else checked and then they sent the money in to refund, would you say that was still reckless disregard or would that be negligence? That would be damage amelioration. You don't get a path if you either submit a claim recklessly or you don't. If you do, are you saying you catch your mistake? I'm sorry. If you double bill at any time, do you say that that could never be negligence if it's certified? Oh, that can absolutely be negligence. If Ms. Collins had a sick child at home and was disconcerted on a single occasion and just rushed through it and was distracted. Well, that should be three times. Well, at some point it becomes a factual question and not something that should be resolved in summary judgment, which is another reason why all of this. In fact, this very discussion demonstrates that there was something in the record below from which one might infer that this defendant acted recklessly. I want to just point out the one case that was cited by the defendant in the letter on this point is Harvard Regents case, which says that this requirement is duty to make some inquiry to ensure that the government demands this. And the government is entitled to this. And that's what the False Claims Act says. It's entitled to something more than nothing when you're asking for money from the government. But that that duty was, quote, not so far reaching as to warrant investigation and supervision of employees every activity. Well, we're not arguing that. That was not a rule of law that had any pertinence to the decision below. We're simply going through the list of facts which show that these people acted recklessly. And what the judge did instead was he he held, again, acting almost consistent with his misarticulation of the statement for summary judgment. He ruled almost as a juror or a bench trial judge that, quote, has failed to convince the court that the submission of the claims to Medicare and the grant was done either with deliberate indifference, excuse me, deliberate ignorance or reckless disregard of the truth and false information. And Judge Smith, the reference you had to the later hiring of the compliance consultant is at the best another fact. It was relevant, which it's not. It's not material because it happened later. But even if it was relevant, it's another another fact that you throw in the basket of all this evidence. And the district court was supposed to look at and say, is there any evidence here from which one could infer that this defendant acted recklessly? And the answer certainly was yes. But instead, he, I think, essentially became a bench jury trial judge. And and then I think misapplied the law that we've talked about on what is reckless disregard. And just so you don't have to rely on me, I just want to refer the court to the Whitcomb case. The land case, the Cabrera Diaz case and the crisis case on this point. I'd like to have something about your retaliatory discharge account. Did Hefner make anyone aware at Hackensack Medical that he was acting in furtherance of an FCA action before he was forced to leave the premises, order off the premises? He did not tell anybody that I am acting in furtherance of an FCA action. I'm looking into an FCA. Well, then how can you say that they fired him because he was ordered off the premises, allegedly because he wasn't shaping up or whatever? So how can you say that he was fired because you don't claim that K-Pak was discussed this with anyone at Hackensack Medical, do you? We don't have to. That was a theory. And I don't discount the possibility, but there is nothing in the record that pins down Ms. K-Pak talking to anybody else. But we don't have to show that. Ms. K-Pak was employed by HVMC. And the notion that we have to rebut or demonstrate a negative that she didn't talk to anybody else is... But you do have to demonstrate protected conduct. That is your burden. Yes, Your Honor. So let me ask the question precisely the way the district court did in its opinion. What exactly did Relator do that could be seen as protected conduct as a precursor to an FCA, to FCA litigation? The answer is the Relator informed Ms. K-Pak of his view of the billing and indicated that he was going to follow with, quote, higher-ups. That's in the joint appendix. But she didn't fire him. She couldn't fire him. And there's no evidence in the record that she told anyone at the Hackensack Medical. But that's rebutting an inference. I mean, there may be room for reasonable disagreement on this. Well, wait a minute. Your burden is not only your burden. It's heightened in this context, isn't it? Our own case law says it's heightened. Yes, Your Honor. Because Mr. Heffner was hired as compliance consultant. And the reason it's heightened, of course, is so that it's because it is not clear when someone is acting as a consultant in compliance that concerns about compliance issues are certainly less likely to lead to or to lead an employer to believe that an FCA action is imminent. And just on that point, you know, he was fired almost immediately after the meeting. So there is an issue here, and I don't want to overstate this, but I think it's there, of whether there needs to be, there should be a rule of law that says that if you're an employer and you have any suspicion that somebody is going to blow the whistle on you, fire them immediately before they can do anything. And in Mr. Heffner's case, before he could talk to Mr. Flynn, who was the director of compliance, to follow up on his concerns. Was this refund to Medicare made before or after the suit was filed? I believe it was made before, just before the suit was filed. The briefs seem to disagree about when it happened, but you say it was before the suit. I believe it was September 11th was the date of the letter. And I, in preparation for argument day, tried to pin down the exact filing date of the complaint and could not do that. I don't think it's material. You obviously may disagree. The sequence is Mr. Heffner's meeting was on July 11th, 2000. The repayment letter is dated September 11th, 2000. And the case was unsealed, I believe, in early 2001. So it's frankly not even clear that the defendant knew, at least had no explicit knowledge of the case, before early 2001 because the case was unsealed. As we go through your various claims here, I'd like to ask about your subsection A-2 claim. I understand, I think I understand the theory behind your A-1 claim. What basis is there here for a subsection A-2 claim? There were no false patient records here, nor do you allege any, do you? We spent some time working on that theory below. You abandon it now? I detect a certain half-heartedness in your response to my question. And you do so insightfully, Your Honor. And the reason is we don't need to because it does seem to us, and this is presented in our summary, which is in the Joint Appendix, that the certifications are false statements made in order to get the false claim paid, which is exactly what A-2 proscribes. And those are listed in the Federal Evidence 1006 summary in the Joint Appendix, I believe, to the A-1 and A-2 sections that we believe are implicated by the various documents. In other words, you have the certification and then you have the attendant invoice. Let me ask you, on your alternate remedy provision, as a relator, you're entitled to the same rights as you had under the FCA, correct? That's correct, assuming the other predicates are there. Now, assume, for the purpose of argument only, that we rule against you on the merits that you lose on the FCA claim. And the government, of course, has collected the money. If we allow you to collect from the government or anyone else, would you have the same rights as a relator in the FCA claim? Or wouldn't your rights be greater than it would be if there were a meritorious FCA claim? If the claim is, if the decision below is affirmed, then there was no evidence of knowledge. Are you entitled to anything on the alternate remedy that the government came in and collected on? And the answer, curiously, is yes, because that's what the statute says. Well, it says you're entitled to the same rights, but then wouldn't it be greater rights that you're getting? Since if this was an FCA claim and the government never stepped in, let's say, they said, we don't see anything wrong here, and it was an FCA claim and you lost, you would get nothing. If the statute, I understand your explanation. I don't think the statute is that detailed. Our theory, and we haven't found a lot legislative history-wise, is that it is phrased broadly because it doesn't want a situation or Congress didn't want a situation where you have to evaluate the relative merit depending on what stage a case is dismissed or summary judgment is granted every time you apply the language of the alternative remedy statute. I think it was, our view is it kind of represents a judgment call that we're going to make this fairly sweeping, and essentially simple language was used. Mr. Cooley, in our Smith-Klein decision, we said that government intervention, government action, could not transform a meritless claim into a source of recovery for the relator. Now, I realize that what we have in this case is the government settling without intervention, but why should that make any difference? I mean, we said in Marina v. Smith-Klein, it is hard to see why Congress might have wanted the fortuity of government intervention to make such a difference. I'm sorry, I'm not sure exactly what you're asking, Your Honor. I'm asking why that distinction ought to make any difference here. Isn't your alternate remedy still foreclosed under that argument by Marina v. Smith-Klein? I mean, in Smith-Klein, as in I think the two other cases cited in the Court's recent letter, there were statements made that an action under the False Claims Act, which for one reason or another is not meritorious, essentially precludes an alternative remedy recovery. But I think one thing that our response to the letter didn't make entirely clear is that in the Smith-Klein case, the lack of merit was that the relator did not qualify as a relator. The original source. Exactly. And the same thing is true in the Donald case, Your Honor, under the Stevens. Why should that matter? Well, in order to, you've got to, you know, you have to qualify as a relator. Either way, it's a windfall for your client, isn't it? Either way, isn't it precisely what the Marina v. Smith-Klein decision felt was untoward under this statute? Unintended, more than poor. I think the statute is sufficiently broad to permit reasonable minds to argue that in any given circumstances an alternative remedy recovery is either a windfall or is not a windfall. But I don't think the statute, I mean, there are other sections. How can you say it's sufficiently broad when the statute in turn says that you're entitled to, quote, the same rights in the alternate remedy situation that you would have if it were a direct FCA action? The same, it doesn't say greater. Your position is if the government collects, I collect. That seems to be more than the same rights you would have as an FCA. Because under FCA, if you don't have a case of recklessness or intent, you don't collect. But the government does. Yes, I think the problem that I see with that is that if that's what the statute means, then the only time a relator actually gets to exercise its alternative remedy rights is when it doesn't need them, is when it has a meritorious claim and it takes it to a conclusion. So I don't think that there's something in between. I'm not exactly sure what it is. Well, in between you could also argue that, look, the government, you woke the government up. The government would maybe have been woken up and therefore the government got this money that might have gone by the board since, I mean, I'm making your argument for you, so that you should have a part of the recovery since without you maybe there'd be no recovery for the government. Well, that is what the case law says. But that's not what the statute says. No, but that's what the case law says. The statute says you have the same rights in the alternate remedy as you do in FCA. It doesn't say if I eat, everyone eats. It doesn't say that. Right. And then the question is, you know, is the statute going to apply or not apply in a different manner at each stage of a case? And then when you get a disposition at that stage, you have to look at, well, what is the color of that disposition? And is that, put the relator at an advantage? Is this a windfall? I mean, you know, going outside the record here, it's not easy to be a relator. And Congress has said over and over again in different sections of the False Claims Act manifest this theory that we want to supplement the government's fraud-funding resources. And if sometimes that results in, you know, a nuanced situation where someone says, you know, it's unfair, that's too bad. Too bad for the defendant. I mean, you know, the Supreme Court has said that one of the purposes of the False Claims Act is to punish defendants and to modify their behavior. And you have a defendant here that's been False Claims Act case after False Claims Act case still not even picking up the phone to ask the provider, hey, are you billing these services? When you say the defendant, you're not talking about, you're talking about the government or the Hackensack paying this? I'm talking about Hackensack at the moment. Okay, not the government. So that was the one distinction I wanted to make in the cases that were identified in the court's letter for the alternative remedy issue, is that I think that they can be grouped into a category which says, here, there was no relator to begin with. I think the closest call on that, and it's frankly, you know, close, is Bledsoe, where it wasn't original source. It wasn't Stevens, the Supreme Court's bargain suing a relator suing a state. It was that you have to, the relator has to be able to at least, quote, file a complaint that is sufficient under Rule 9B. So, you know, that's the closest of the three cases I can see to, you know, merging into the actual merits of the relator's action. And finally, I'm period over my time, on an almost administrative issue, the integrated enterprise issue, I want to refer the court, at least for the record, to, because this is not well documented, the integrated enterprise facts are not well documented in our brief, and I want to refer the court, if the court is inclined to have someone look, to our opposition, in the record below, to the CID motion for summary judgment, pages 9 through, sorry, 4 through 9, which is a fully annotated version of those facts. May I answer, may I try to answer more questions? Thank you very much. Thank you. We'll be back up above. Thank you. Mr. Fagan, am I pronouncing your name correctly? Yes, Your Honor. May it please the court, Eric Fagan for the United States. As the court is aware, the United States was not a participant in the underlying False Claims Act action, so we have no position on whether the plan should prevail on the merits. What we are in this case is to make clear that the defendant's voluntary repayment of the Medicare overcharges has no effect on the plaintiff's rights whatsoever. It does not give him any immediate right to recovery. As this court made clear in Dunleavy, what happens now is that the relator has the exact same right he always had, to pursue his Keat-Ham action. If he prevails on the Keat-Ham action, he's entitled to whatever damages, he's entitled to the relator's share of whatever damages the government winds up recovering. That would include any, the voluntary amount that was already repaid to the government would be considered an offset to those damages, and the relator would get his share of that as well. But lacking any, as the case now stands, with the relator's Keat-Ham action having been dismissed on the merits, he's entitled to no recovery because under no circumstances does the False Claims Act allow a Keat-Ham relator to file an action that has no merit. In other words, there has been no fraudulent claim, and nevertheless, the relator can still recover. And there are two alternative reasons besides the lack of merit to the action as to why the relator shouldn't be allowed to recover here. One is the voluntary repayment to the government doesn't constitute an alternative remedy than the meaning of the act. It's not the type of, it's not a case where the government has elected to pursue a claim, its claim of fraud through some alternative remedy. When did this refund occur with respect to when the case was filed? The district court said the case was filed in August or September of 2000, and the repayment was made on September 11th, 2000. Were the defendants on notice that the case had been filed at that time? As with plaintiff's counsel, Your Honor, I'm not 100% certain of the answer to that question. Obviously, if it was the August or early September period, then they were certainly on notice. If it was in late September, they may not have been on notice that the false claims action was coming. However, I don't think that issue is relevant to plaintiff's entitlement to recovery under the alternative remedy provision because no matter when that voluntary repayment was made, whether the action had already been filed or hadn't already been filed, the plaintiff has no right to appease the voluntary repayment. And that's because, as I already said, he filed a meritless FCA action according to the district court. And if this court affirms that judgment, he's not entitled to share any part of the voluntary repayment. The second reason is it's not an alternative remedy. As you can see in the record on page 65, what happened was the defendants simply sent a letter to the government's Medicare intermediary saying, we're sorry we overcharged you. Here's $5,258.97 and are telling you which claims they're linked to and closed two checks. What constitutes an alternative remedy that requires some kind of action by the U.S.? I know if the U.S. was involved in the case, that's one thing. But can the relator recover if the U.S. does not come into the case at all? No, Your Honor, that goes to the third reason the relator can't recover, which is that unless the United States intervenes, it's not an alternative remedy. An alternative remedy, as the statute's language makes clear, is when the government elects to pursue its claim, meaning its fraud claim, through an alternative remedy available to the government. So when the alternate remedy provision takes effect is when the government intervenes, stays the proceedings in the key TAM action, and elects to pursue its remedy through some sort of alternate remedy. For instance, the remedies that might have been available in this case, HHS has various civil false claims penalties under Chapter 42. Even putting aside whether the government intervened here or whether the statute is drafted in such a way as to require the government to intervene before the alternative remedy is triggered, did the government, quote, elect to pursue anything here as the facts unfolded in this case? No, Your Honor. As I was just explaining in response to the question by Judge Seiler, the government's Medicare intermediary, Empire, simply received a letter informing it of the overcharges and a check, and two checks, and a list of the alleged overpayments that were made. And the government didn't elect to pursue any remedy within the meaning of the statute. And to the extent there's any question as to what Congress intended when it enacted the statute, the legislative history couldn't be any clearer. It says the section clarifies that the government, once it intervenes and takes over a false claim suit brought by a private individual, may elect to pursue any alternative remedy for recovery of the false claim which might be available under the administrative process. That plainly doesn't apply to the circumstances here, and we ask the Court to affirm the judgment on the alternative remedy issue. Thank you, Mr. Fahy. Jackson. May it please the Court, my name is John Jackson. I appear for the Appellee, Hackensack University Medical Center. I would like to start by dealing with the issue of, is there evidence that supported the prima facie claim that was being presented here? And I want to start with the point that Mr. Cooley made about the fact that there were these false claim acts pending against Hackensack University Medical Center. It was under attack, it knew that its billing system was defective and it acted continuously in deliberate ignorance or reckless disregard. I don't know where that is in this record. What we have is a settlement that involved Hackensack University Medical Center in the year 2002, which is after the events here. Now, the investigation that had started, and this is a nationwide investigation involving pneumonia coding, began earlier, and there's reference that in May of 2002, an action was started in the District of New Jersey. And that is in the record at page 880 through about 90. The notion that that provides some evidence to support an idea of reckless disregard or deliberate indifference, I think, is mistaken. There was a question asked as to this report that revealed some kind of error rate of about 85%, I believe, and it seemed to me that perhaps that could even be viewed as a double-edged sword, and I was a little surprised that Mr. Cooley did not respond in that fashion. Couldn't it be argued that really the knowledge of such an error rate out there in this particular field should put the defendants on some kind of inquiry notice here? Yes, Judge Smith, if that report and the information about that high error rate were known beforehand. What is the record showing? That report came out again in September 2000. It was after this repayment or return of an overpayment had been made. As the agency administering that grant became more aware that there was some confusion as to the interrelationship between the grant, and that's what that report deals with, and Medicare, which is a separate source of funding. I want to also pursue this idea that it is necessary to do something more than nothing, and the assertion that all that this record reflects is that nothing was done. Nurse Collins was responsible for the grant vouchers and those submissions. She had nothing to do with the Medicare submissions that was done on behalf of NJPC and submitted through its billing department over there that was part of it. So she was certifying to what? She was certifying that for purposes of the grant, that the services that were called for and laid out there, which include such things as providing transportation, reimbursing taxi cab fare for AIDS patients coming to the hospital clinic, some housing assistance, and also medical services, which are not patient-specific, had been provided and that voucher claim had not been submitted previously and had not been paid. This went on for quite a period of time. That's a term that we would need to define. Which wasn't a one or two-shot deal. It was. It went on over approximately two years. Would that tend to show something beyond mere negligence that it continued for this period of time? I don't know. If she made a mistake in believing that because she was with Dr. Sperber in the clinic and she saw him render these services and she was the one who doled out the money for the taxi cab fare, she did something more than nothing. She had direct knowledge. She didn't go check with anybody else to say, by the way, are you also doing something about these services? And that's where the problem is here. Well, did she sign the certification that went to the Medicare provider? Absolutely not. Okay. Totally unrelated. She just sent this to the grant. Yes. And the Medicare claims were submitted separately. So she was improperly trained. She should have been better trained. No question about it. I think she should have been better trained. That may be the case. And this went over a period of several years. It went over a period of a couple years. Why would that be a jury question as to whether that was utter New Jersey law? Whether that was reckless conduct? Well, because, again, I think the question becomes, under the standards that apply here, should she have been thinking that a different entity, although related, was billing for these services? Why would she come up with that idea? Well, she made a mistake. But the question is, should the mistake have been cured by her employer in proper training? Well, Judge Carroll, I'm not sure she made a mistake, because the grant is intended to supplement the funding of services that may be paid for by private insurance for people who have that, by Medicaid, when that's applicable, or Medicare. It doesn't eliminate that. And so the assertion that she made a mistake, I think, is rushing to judgment too quickly. Not really. Okay. She had a certain information. She didn't know. Well, is there anything inherent in a failure to train that, by definition, constitutes recklessness? I think it depends on the task that one is being asked to do. And if there is a risk of death and you don't train someone on how to use some machinery or how to do a medical procedure. Well, that's not our case. No, that's not. Okay. I think it becomes qualitative. And here, the training is, these are the forms, this is the grant, review it. You're the one that's going to... She was directly involved in this program, not involved in the Medicare bill. She had direct knowledge and had been involved in making these grant applications since 1995, although at that time, physician services were not being funded through the Ryan White grant. Okay. Okay. The light is on. No, no, go on. Okay. The other thing is about the Medicare claims and the assertion that something, more than nothing, should have been done. Well, those Medicare claims were submitted for patients who were Medicare eligible, were for services that there's been no challenge that they were provided, in fact, and they're true, and were medically necessary. What more information would one obtain by looking somewhere else? Okay. Dr. Sperber didn't look at those bills before they went out, but where is there evidence that he needed to? And if he did, what information would he have found? That this was a Medicare eligible patient, he had treated this patient, and it was the level of service that is described in the bill. That, I don't think, constitutes knowledge that was deliberately disregarded or ignored and that's the issue for recklessness. Did anybody sign any kind of a certification that went to the Medicare provider? Judge Steinle, I believe that the answer to that is sort of. These were electronically submitted claims, so there is the equivalent of a signature. But nobody actually signed something and said, I've reviewed these or anything like that. Why wasn't the talking, the knowledge of KPEC sufficient to put Hackensack Medical on notice that Hefner was pursuing a FCA claim? I'm glad you asked me that question, Judge Cohn. We aim to please you. What other questions do you want me to ask? As I understand Mr. Hefner's claim, this man with all this experience with Medicare comes to Hackensack University Medical Center and discovers a fraud being done by the hospital, this teaching hospital with many physicians there, because this office manager tells him about it, about something that she had uncovered, and as she understood it, there was a double billing occurring to Medicare and to the Brian White grant, which she had reported and which was being checked on by the compliance department. Not being ignored, but being checked, how many claims are here, etc. She tells him, I'm glad you're here because we make mistakes. That's what he was there for. That's what he was there for. But she tells him, okay, this is his great discovery, and he says, well, I'm going to talk to Tom Flint, who's part of the compliance program. She's an office employee who had found out this information. She's not expecting any false claim activity to be done, and he's not telling her, oh, I'm going to start false claims action here, or I'm going to call the U.S. Attorney. The report was, I'm going to go talk with the guy who's supposed to be supervising this as part of this educational remedial program. Again, not an act that shows reckless disregard or deliberate indifference to what has happened, but the contrary, that here is an institution which knew that this is a complicated area of the law to comply with and was taking steps by having brought in consultants to try and train people so they could do it better. Thank you very much, Mr. Jackson. Mr. Schmidt, according to our minutes here, you've traveled from New Jersey for two minutes of argument. In case you haven't noticed, we don't pay a lot of attention to that. Yes, Your Honor. Please record John Schmidt, and that was somewhat of a running joke between Mr. Jackson and myself last week. He didn't offer you any of his time, though, in the course of the running joke. Well, he did. All right. That's why I'm here. Your Honor, this case, with regard to my client, which is North Jersey Primary Care Associates, is very fact-specific, and I think the court has to look at every one of these situations factually. North Jersey Primary Care was a professional services corporation, which was established through the auspices of the hospital to provide for medical staffing for its various departments, not simply the infectious disease clinic that is the focus of this case, but for all of the departments. Through its contractual relationship with the hospital, in fact, it arranged for the hospital to do the billing for its Medicare claims. As Mr. Jackson said, in this particular case, the Ryan White grant was very specific, and it said that, first off, you should apply for Medicare, and that's what happened in this case. Dr. Sperber provided services in the clinic. Thereafter, the Hackensack University billing department submitted claims to Medicare as they were supposed to do, even under the Ryan White grant, so there was no falsification. There's no allegation in this case that those claims which were submitted, the 60-plus claims, had anything false or misleading about them. Most of them ranged in the vicinity of $5 to $8. They weren't substantial in and of themselves. But they weren't supposed to be paid. Well, that's an issue that we're not sure of, Your Honor, because, in fact, the grant says that these claims, you're supposed to submit first to Medicare, which they did. And, in fact, there was a Ryan White grant which was supposed to be submitted also to pay for extras. Now, you have the billing department here. You have Nurse Collins on this side. Is there anything that the billing department should have recognized at that point that they were doing wrong that would, in fact, have caused them to engage in what I believe is an enhanced knowledge to get to that reckless disregard, which may have gone beyond negligence? At best, maybe there was negligence, that the billing department should have been aware of the grant or the grant should have been aware of the billing department. But to say that you get to that elevated status, this case is similar, I think, to a case, which I apologize to you, Your Honor, I didn't cite, but it's USXL Malam versus Regents of the University of California. It's a district court case, but I think the facts are similar in that case. It was a citation. 912, fed sub 868. In that case, there was a researcher, Your Honor, who relied upon information provided to him by his research associates in submitting for a grant. And in fact, some of the research information was later determined to be incorrect. And in that case, the district court said, and I think a very recent decision, that based on the circumstances and the large number of people involved, that the researcher is entitled to rely upon the information and the truthfulness of the information being asserted. Here you have New Jersey primary care associates with a contractual relationship for a billing department to do what they thought was correct. And in fact, they relied upon Hackensack University's billing department to submit claims on its behalf. New Jersey primary care associates never signed anything. Dr. Sperber's name was electronically submitted. But the payments came to New Jersey primary care associates, not to Hackensack University Medical Center. And in fact, when there was a determination by the hospital's own internal investigation that a mistake was made, that there was, in fact, double payments that were made, New Jersey primary care associates immediately repaid the monies. In this case, they repaid the monies in September by letter dated September 11, notwithstanding the fact that they had no knowledge of any claim, because clearly Mr. Heffner, in this case, provided no services to New Jersey primary care. But the other interesting thing is they weren't joined as a party until almost two years later. I hate to drive a wedge in what may be comrades of arms, as you gentlemen all appear forth today, but do I take it from your recitation that the liability of your organization and Hackensack Medical, if there is any, is separate and distinct, one from the other? I think it is separate and distinct, Your Honor. But I think the key here is that you have two entities, two completely different billing sections or departments, and there would be nothing, there should be nothing that would key the billing department when properly submitting Medicare claims with proper information on the claim in accordance with the Ryan White grant that says you should go to Medicare first. That should cause them to look elsewhere to say, wait a minute, something is incorrect here. Not even vicarious? I don't think so, Your Honor. I don't think, and even if it was vicarious, Your Honor, it's negligence. It doesn't raise to the next level of reckless disregard. I think as a matter of law, it doesn't get to the issue. But if the other party is reckless, is their vicarious reckless? I don't believe so, Your Honor. And I don't believe there's any case that addresses that issue. Thank you. Thank you very much, Mr. Schmidt. Mr. Burrell? May it please the Court, if you're wondering why Mr. Schmidt made the trip down from New Jersey, perhaps you're wondering even more why I'm here, since at best we're a tangential party to this, and frankly, I don't really understand why we're here. The issue with respect to my client, the Center for Infectious Diseases, known as CID, is whether under the circumstances of this case, CID and HACU-SAC and North Jersey actually engage in false billing to Medicare as a single entity or as an alter, or that we were somehow an alter ego of the hospital and of North Jersey. And I think it's clear from the facts in this case that we were neither of those things. First of all, it's undisputed that the services at issue in this case were not provided by CID. CID also, of course, did not bill for the services. It had nothing to do with the billing whatsoever. So it's undisputed that there was no nexus between the alleged false claim and CID.  So how does the relator make the claim that CID should be held somehow held responsible? By claiming that we was clearly a separate corporate entity. The record is clear. It's undisputed that we were an entity which filed a separate corporate identity, went through all the requirements of a corporate entity. There was a shareholders agreement. There are employment agreements between the entity and the individual physicians. All of that made part of the record. And indeed, there were arm's length transactions between CID, a physician group, and the hospital. There was a lease in place where we paid rent to the hospital. So as if we were given anything. So there was clearly a separate corporate entity from the hospital. Now the relator says that we were in the same location. And I don't know what he means by the same location, because we happen to be located in an office building adjacent to the hospital, but not in the hospital itself. That the physicians are listed on the website of the hospital, and that the physicians are on the medical staff, and that we happen to share an employee. But if you make that case, if you want to make that argument, the argument the relator is making is that any physician group which rents space from a hospital on its campus is a single entity. Because hospitals today have websites, they list the physicians who are on their staff. The fact that they're on the medical staff doesn't mean that they're employees of the hospital, doesn't mean even that they necessarily have a contractual relationship with the hospital. It simply means that they provide care at the hospital. And that, I submit to you, does not convert them into a single entity under the law. Did CID receive any of the funds that are in question here? Absolutely not. Absolutely not. Now, it turned out that one of the physicians of CID didn't work for North Jersey and provided the services, but he was doing that as part of North Jersey. And it's not alleged in the complaint that this was an act by CID, because it clearly wasn't. I'll be happy to answer any questions. Thank you very much, Ken. Mr. Cooley, you have your rebuttal. I'm going to restrain myself from repeating myself, because I think that I simply want to underscore that what is a mistake versus what is reckless or deliberate indifference is not a matter of debate. It's actually mapped out in the case law. And in response, and on that point I'll just note, which is actually already in the record, this court's Kentengan opinion, which was a false claims opinion. And in connection with the discussion of reckless disregard, this court said that because it's a matter of what's, to some extent, of what's going on in somebody's mind, it is generally unsuitable for summary judgment. All the more the case here, where there's abundance of evidence of recklessness. Mr. Gural, I think, has stated one view of the factual record with respect to the connection between CID and HMC. I'm not going to go through the facts, because they are in the record in the brief that I mentioned. I will simply surmise that if one were to enter the CID premises on the Hackensack University Medical Center campus, one would not know that one was at CID and not Hackensack University Medical Center. In fact, on the website, the Hackensack University Medical Center website, they show CID, or at least at the time, they showed CID as a division of Hackensack University Medical Center. And the facts just blossom out from there in terms of why even the defendant would view CID in the manner that the relator now views it, and that CID says is not the case. And finally, Your Honors, Judge Smith, your question, which came straight from the alternative remedy statute, of whether there's anything in the record that shows that the government elected to proceed with alternative remedy. Yes, which is certainly an apt question. And I think our position on that would be that in accepting the payment, the government made an election to an alternative remedy. How is that pursued? That's a word that my comment here doesn't touch. Is it received on a passive act? Yeah, I think it is pursued only in the sense of how you want the statute to work. Well, no, I assume that words mean things and that Congress intends words that they select to mean particular things. I mean, I guess the fact that you're correct, the word is in the statute, the question, all I can say is that this is a statute that is going to operate in accordance with the fact that nuances such as the money was received as opposed to the money was requested and then received. And if that's the court's view, then that's your prerogative. My, our view, relator's view is that it would not make good law. And I certainly say that respectfully, Your Honor. Thank you very much, counsel. Thanks to all the counsel. We will take the case under advisement and we will ask her to adjourn the court.